**Donya Leigh ANDERSON, Plaintiff,**

v.

**UNUM LIFE INS. CO. OF AMERICA, d/b/a UNUM Provident Corp., Defendant.**

**No. 2:01 CV 894 D.**

United States District Court, M.D. Alabama, Northern Division.

Feb. 13, 2006.

M. Clayborn Williams, Thomas O. Sinclair, Jonathan H. Waller, Campbell Waller & Poer LLC, Birmingham, AL, for Plaintiff.

Stephen R. Geisler, Kristen S. Cross, Christopher A. Bottcher, Kaye K. Houser, James S. Williams, Sirote & Permutt, P.C., Birmingham, AL, for Defendant.

### MEMORANDUM OPINION AND ORDER

DE MENT, Senior District Judge.

## I. INTRODUCTION

Plaintiff Donya Leigh Anderson ("Anderson") brings this lawsuit against

UNUM Life Insurance Company of America ("Unum"), challenging Unum's decision to deny Anderson's claim for long-term disability benefits under a group policy offered by her employer, Shaw Industries, Inc. ("Shaw Industries"). This cause arises under the Employee Retirement Income Security Act ("ERISA"), 29 U.S.C. §§ 1001–1461, and, specifically, is a claim for benefits pursuant to 29 U.S.C. § 1132(a)(1)(B). The parties have stipulated that the merits of this case may be submitted and tried on the written record, although there are disputes as to the applicable standard of review and the scope of the record for review. (Order (Doc. No. 89)); (*see also* Order (Doc. No. 87).)

Anderson and Unum have submitted briefs and evidentiary submissions in support of their respective and opposing positions. (*See* Anderson Br. & exhibits attached thereto (Doc. No. 90); Unum Br. & Exhibits attached thereto (Doc. No. 93)); (*see also* Anderson Reply (Doc. No. 94).) The court carefully has considered the arguments of counsel, the relevant evidence and the applicable law and, for the reasons set forth herein, finds as follows: (1) The delegation of authority by Unum to Unum-Provident to decide Anderson's claim for benefits was not authorized by the policy, thus, necessitating *de novo* review; (2) the *de novo* standard of review permits consideration of evidence which was not before the claims administrator at the time the decision to deny Anderson's claim was made; and (3) Anderson is entitled to benefits under the policy in the amount of $6099.97, plus prejudgment interest.[1]

1. As stated, the parties agree that this case may be tried on the written record. The court observes that, even absent this stipulation, the court finds that the record is sufficiently developed and that there are no material facts in dispute such that neither an evidentiary hearing nor a full trial is neces-

## II. JURISDICTION AND VENUE

The court exercises jurisdiction over this removed ERISA action pursuant to 28 U.S.C. § 1441(a) and 29 U.S.C. § 1132(a)(1)(B). *See Lazorko v. Pennsylvania Hosp.*, 237 F.3d 242, 247 (3rd Cir. 2000). Venue is proper in the Middle District of Alabama pursuant to 29 U.S.C. § 1132(e)(2) and 28 U.S.C. § 1391.

## III. BACKGROUND

### A. *Procedural History*

Anderson purchased a long-term disability insurance policy from Unum which was made available to her through her employer, Shaw Industries. Unum's denial of Anderson's request for long-term disability benefits prompted Anderson to sue Unum. Anderson originally filed this lawsuit in state court, alleging state law claims, but Unum removed the action here based on federal question jurisdiction arising from ERISA's preemptive effect or, alternatively, based on the presence of diversity jurisdiction. *See* 28 U.S.C. §§ 1331, 1332, 1441. Unum contended, in part, that Anderson's claims, properly pleaded, were ERISA claims because the policy at issue was an "employee welfare benefit plan" within the meaning of 29 U.S.C. § 1002(1).

In an opinion previously entered in this case, the court agreed with Unum and dismissed Anderson's state law claims, but permitted Anderson to file an amended complaint to state an ERISA claim. Although first disallowing an interlocutory appeal (*see* Orders (Doc. Nos. 41, 44)), the court granted Anderson's motion for reconsideration and permitted Anderson to

sary to resolve this case. Indeed, the court observes that application of the summary judgment standard would yield the same result. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 322, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); Fed.R.Civ.P. 56(c).

appeal the court's ruling on the issue of ERISA preemption. (*See* Doc. Nos. 57, 80.) The Eleventh Circuit affirmed. *See Anderson v. UNUM Provident Corp.*, 369 F.3d 1257 (11th Cir.2004). The policy at issue in this case, therefore, is governed by ERISA.[2]

Subsequently, Unum filed a motion for an order that the case be tried on the briefs and asserted that, under an arbitrary and capricious standard of review, the court is limited to examining the administrative record. (*See* Unum Mot. for Order Requiring Case to Be Tried on Briefs at 2, ¶ 3 & n. 1 (Doc. No. 55).) Anderson initially opposed Unum's motion (*see* Doc. No. 67), but later agreed with Unum to the extent that she conceded that the court may resolve this case based upon the written submissions. (Doc. No. 87.) Anderson, however, advances the position that *de novo* review applies to her ERISA claim for benefits and that the court may consider evidence outside of the administrative record.

### B. *The Policy*

In 1990, Anderson began employment as a full-time hourly employee with Shaw Industries, the "largest carpet manufacturer in the world." *Anderson*, 369 F.3d at 1259; (Anderson Aff. ¶ 3 (Ex. to Doc. No. 90).) By virtue of her employment with Shaw Industries, Anderson was covered by a group long-term disability insurance policy issued by Unum, Policy Number 550054 (hereinafter "the policy"). All long-term disability benefits under the policy are

paid by Unum. *See Anderson*, 369 F.3d at 1266.

The policy refers to Unum Life Insurance Company of America as "Unum." (*See* UPCL00071 (Ex. to Doc. No. 93).) The Certificate Section of the policy states: "When making a benefit determination under the policy Unum has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy." (UPCL00061 (Ex. to Doc. No. 93).) A complete copy of the policy is part of the record, *see, supra,* footnote 2. (*See* Ex. to Doc. No. 93.)

The policy provides that whether an insured is "disabled" is a determination made by Unum and defines "disabled" as follows:

— You are **limited** from performing the **material and substantial duties** of your **regular occupation** due to your **sickness** or **injury**;

— You have a 20% or more loss in your **indexed monthly earnings** due to the same sickness or injury; and

— during the elimination period, you are unable to perform any of the material and substantial duties of your regular occupation.

(UPCL00057 (emphasis in original) (Ex. to Doc. No. 93).)

The policy embodies a "glossary" of terms. The policy defines "limited" as "what you cannot or are unable to do," (*see* UPCL0039 (Ex. to Doc. No. 93)), and "material and substantial duties" as those

---

**2.** The policy is attached as exhibit 1 to the pleading which the clerk has labeled as document number 93. Herein, the court references the policy and other of Unum's exhibits by both the document numbers assigned to them by the clerk and the bate stamp numbers designated by Unum. The policy, for example, is numbered by bate stamp in reverse order from UPCL00071 to UPCL00037.

Because Anderson and Unum have not argued otherwise, the court presumes that the

policy constitutes the entirety of the ERISA "plan." *See* 29 U.S.C. § 1002(1) (ERISA refers to and governs "employee welfare benefits plan[s]"). To avoid any confusion, the court notes that in this opinion it uses the words "policy" and "plan" interchangeably; thus, references to the policy may be construed as references to the "plan" and *vice versa.*

"duties that ... are normally required for the performance of your regular occupation; and cannot be reasonably omitted or modified." (*See* UPCL00039 (Ex. to Doc. No. 93).) "Regular occupation" is defined as "the occupation you are routinely performing when your disability begins." (*See* UPCL00038 (Ex. to Doc. No. 93).) "Sickness" includes "an illness or disease" which commences while the insured is covered under the policy. (*See* UPCL00037 (Ex. to Doc. No. 93).) "Elimination period" is defined as "a period of continuous disability which must be satisfied before you are eligible to receive benefits from Unum." (*See* UPCL00040 (Ex. to Doc. No. 93).) The elimination period under the terms of the policy is 90 days. ("Benefits at a Glance," UPCL00069 (Ex. to Doc. No. 93).)

### C. *Anderson's Long–Term Disability Claim*

Anderson worked full-time as a "color sampler" for Shaw Industries and, at all times relevant to this lawsuit, was insured under the policy at issue.[3] In March 2000, Anderson learned that she was pregnant. After March 23, 2000, Anderson did not return to her job at Shaw Industries. On March 29, 2000, at approximately six to seven weeks gestation, Anderson sought treatment from her obstetrician, Dr. Kathy Payne ("Dr. Payne"), who on that date ascertained that Anderson was "disabled" due to pregnancy-related symptoms. (Attending Physician Statement (UPCL00003) (Ex. to Doc. No. 90)); (Dr. Payne Dep. at 22–23 (Ex. to Doc. No. 90)); ("Prenatal Record," UPCL00008 (Ex. to Doc. No. 90).) Anderson initially received weekly short-term disability payments in the amount of $175.00 for 13 consecutive

weeks.[4] (*See* UPCL0005–UPCL00006 (Ex. to Doc. No. 90)); (Anderson Dep. at 48 (Ex. to Doc. No. 93).)

On or about May 26, 2000, Anderson submitted a long-term disability claim under the policy. The preprinted claim form provided that the form must be completed by the claimant, the employer and the attending physician and that "[i]ncomplete or illegible answers may result in delay of payment consideration." (Anderson's claim form (UPCL00002–UPCL00007) (Ex. to Doc. No. 90).)

On her claim form, Anderson identified her disabling sickness as "pregnancy." In response to the question asking the date she was "first treated for this condition," Anderson answered, "March 29, 2000." (UPCL00005 (Ex. to Doc. No. 90).) She indicated that she began receiving treatment on that date from Dr. Payne. Anderson noted, and Shaw Industries confirmed in its portion of the claim form, that Anderson's last day of work was March 23, 2000. (*Id.*); (UPCL00006 (Ex. to Doc. No. 90).) Shaw Industries also provided that, during Anderson's last two-week schedule, she worked a three-day, 36–hour shift for one week, followed by a four-day, 48–hour shift the next week. (UPCL00006 (Ex. to Doc. No. 90).)

On her claim form, Anderson described her job duties as a "color sampler" as follows: "lifting 50 lb. packages to combine buggies, pushing and arranging 1,000 lb. buggies, stretching, bending and squatting to lace and doff color check machines." (UPCL00005 (Ex. to Doc. No. 90).) She indicated that, on a weekly basis, she devoted 30 hours combined to these physical tasks, but that her "pregnancy" restricted

---

3. Anderson's job duties are set out below.

4. This court expresses no opinion on Anderson's entitlement to short-term disability payments, and nothing in this opinion

should be implied to express any opinion thereon. This court solely is concerned with whether Unum erroneously denied Anderson long-term disability benefits under the terms of the policy.

her from continuing to perform these duties. (*Id.*)

Shaw Industries also completed a "job analysis" form as part of Anderson's claim package. (UPCL00002 (Ex. to Doc. No. 90).) Shaw Industries provided that Anderson's work required considerable standing and walking on a concrete surface and that her job required lifting and carrying packages weighing up to 45 pounds, and pushing or pulling 1200–pound buggies approximately 45 times per day. On the form, Shaw Industries further noted that Anderson's job required occasional bending, squatting and reaching. Shaw Industries also attached a "detailed description" of Anderson's job responsibilities:

> Ms. Anderson, an hourly employee[,] works 12 hour rotating shifts. As a Color Sampler, she is responsible for transporting empty buggies to the Extrusion Department. She also runs color samples through a Drawtexturizer machine and carries them to the Quality Assurance Lab. Ms. Anderson is standing, walking, bending, stooping, squatting, and reaching during the 12 hour shift.

(*See* UPCL0001 (Ex. to Doc. No. 90).)

Dr. Payne completed the "Attending Physician Statement" which Anderson submitted with her claim form. In the portion of this statement which asks, "[i]f the patient is medically unable to work now, please explain, including present restrictions and when restrictions began," Dr. Payne responded as follows: "13 + 1 weeks pregnant on 5–15–00, placed on leave 3–23–00 due to prior pregnancy history." (Attending Physician Statement (UPCL00003) (Ex. to Doc. No. 90).) Dr. Payne indicated that Anderson's estimated date of delivery was November 18, 2000, and that Anderson would be able to return to work full-time on January 3, 2001. Until that time, however, as noted by Dr.

Payne, Anderson was not "released" to work in her occupation or in any occupation. Responding to whether Anderson had "ever had same or similar condition(s)," Dr. Payne responded "yes" on "8/17/98." (*Id.*)

The form also contains a section for the attending physician to assign a "[p]rimary [d]iagnosis" code. Dr. Payne stated that the ICD–9 Code for Anderson's primary diagnosis was "650." This code means "[d]elivery in a completely normal case." (*See* Ex. 4 to Doc. No. 93 at 6.) Dr. Payne left blank the portion of the form which reads, "[f]or pregnancy, describe complications, if any." (UPCL00003 (Ex. to Doc. No. 90).)

### D. *Unum's Long–Term Disability Benefits Determination*

#### 1. *Unum v. UnumProvident*

Initially, the court observes that an issue in this case has arisen as to whether Unum is the entity which made the decision to deny Anderson's claim for benefits. As discussed later in this opinion, resolution of this issue is decisive of which standard of review governs in this case.

The Certificate Section of Anderson's policy provides that, "[w]hen making a benefit determination under the policy, Unum [Life Insurance Company of America] has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy." (UPCL000061 (Ex. 1 to Doc. No. 93) ("Certificate Section") (brackets added).) There is, however, a multi-page General Services Agreement entered into between UnumProvident and its "subsidiar[y]," Unum, which indicates that Unum assigned claims administration duties to UnumProvident. (*See* General Services Agreement at 1 (Ex. to Doc. No. 94).) That Agreement provides that UnumProvident shall "[p]rovide comprehensive

claims management services, including: Review claims and medical files, determine if claims are payable, maintain and search databases, interview doctors, attorneys, employers and employees and process claims for payment."[5] (*See id.* at Appendix-6.) It further states that "[t]he parties agree that UNUM Provident is engaged in an independent business and will perform its obligations under this Agreement as an independent contractor and not as the employee, partner or agent of [Unum]." (*Id.* at 9.) Additionally, pursuant to this Agreement, UnumProvident "maintain[s] the exclusive right to exercise discretion and control over associates performing services for [Unum]." (*Id.* ¶ 1.4.) As discussed below, the individuals who made the decision to deny Anderson's claim for benefits have identified themselves as UnumProvident employees.

### 2. The Initial Review and Denial of Anderson's Claim

By letter dated June 12, 2000, Anderson was notified that her claim for Unum disability benefits had been received. The letter in the record is not signed, and no name is provided, but the signature block indicates that the letter was authored by an individual with UnumProvident's "customer care center." (UPCL00009) (Ex. to Doc. No. 90.) The letter contained UnumProvident's toll-free telephone number for Anderson to call if she had "any questions." (*Id.*) The letter further provided, "We are reviewing your claim and will contact you if additional information is necessary to determine your eligibility for benefits." (*Id.*)

Adam Boothby ("Boothby"), who identifies himself as a "customer care specialist" for UnumProvident Corporation (*see* UPCL00014–15 (Ex. to Doc. No. 90)), was assigned to Anderson's case. (*See generally* Boothby Dep. at 105–24 (Ex. to Doc. No. 90).) Boothby completed a preprinted "Genex referral form," in which Boothby requested Genex to conduct an "[e]arly intervention/3 point contact" on Anderson's pregnancy disability claim and respond via e-mail.[6] (UPCL00011 (Doc. No. 90).)

Thereafter, Vicki Chambers ("Chambers"), a registered nurse associated with Genex, conducted a review of Anderson's claim for disability benefits. (Marilyn Howard Dep. at 81 (Ex. to Doc. No. 90).) The administrative record contains a 20-line e-mail sent on June 22, 2000, from Chambers to Boothby. (E-mail (UPCL00013) (Ex. to Doc. No. 90).) As recited in the e-mail, Chambers called Dr. Payne's office and spoke to Tammy Herbal ("Herbal"), Dr. Payne's employee whom Dr. Payne identified as the individual who is responsible for handling insurance matters. (Dr. Payne Dep. at 19 (Ex. to Doc. No. 94).) According to Chambers' note of her conversation with Herbal, Chambers learned that Anderson's first office visit concerning Anderson's pregnancy was March 29, 2000, and that Anderson's estimated date of delivery was November 18, 2000. Herbal further informed Chambers that Anderson was "out sick" for a week prior to her first office visit, that Anderson suffered from "some hyperemesis," that on June 11, 2000, she received "iv fluids" and Phenegran for nausea and vomiting, and

---

**5.** The court notes that, other than the above-cited General Services Agreement, there is no other evidence in the record describing the relationship between Unum and UnumProvident.

**6.** Evidently, Genex is a referral agency for Unum, but there is no elaboration in the record. The court also has not been informed as to what a "three-point contact" entails, but it appears that this phrase means contact with the employer, the employee and the attending physician.

that Anderson was receiving B–12 injections. (e-mail (UPCL00013) (Ex. to Doc. No. 90).)

As further set out in the e-mail, Chambers also learned that Anderson had a history of gastric bypass in 1990 and, that during a prior pregnancy in 1998, Anderson had to take an early maternity leave. According to Chambers, as to the pregnancy at issue, Herbal stated that Anderson had relayed that she was unable to perform her job, namely that she could not lift 50 to 60 pounds and that Shaw Industries would not accommodate a job modification. Herbal indicated that Dr. Payne did not have any *written* restrictions and limitations in Anderson's chart, but that, when a patient informs Dr. Payne that she is unable to perform her job, Dr. Payne "writes [the patient] out of work." (*Id.*); (*see also* Boothby Dep. at 105–06 (Ex. to Doc. No. 90).) In the e-mail, Chambers also provided that she reviewed the guidelines published by the American College of Obstetricians and Gynecologists ("ACOG"). Relying on the ACOG guidelines and on the absence of written restrictions or limitations in Dr. Payne's medical charts on Anderson, Chambers concluded that "at this time and with the information provided [employee] is not supported leaving her job at 6+ wks. of gestation on 3/23/00." (e-mail (UPCL00013) (Ex. to Doc. No. 90).) Finally, the e-mail contains a notation that Chambers had "no contact" with either Anderson or Shaw Industries. (*Id.*)

At his deposition, Boothby stated that the decision to deny Anderson's claim was made by him.[7] (*See* Boothby Dep. at 110, 114, 118–19 (Ex. to Doc. No. 90).) He said that he based his decision primarily on

Chambers' e-mail, in particular, on the absence of any restrictions or limitations having been listed in Dr. Payne's medical charts. (Boothby Dep. at 110, 114–20.) He also had a one-page medical record from Dr. Payne documenting Anderson's prenatal history from March 29, 2000, to May 15, 2000. (*See* Boothby Dep. at 110 (Ex. to Doc. No. 90)); ("Prenatal Record," UPCL00008 (Ex. to Doc. No. 90).) The medical record contains general information, such as Anderson's weight and blood pressure, measured on each of Anderson's six office visits with Dr. Payne beginning March 29, 2000, and ending May 15, 2000. Although some of the handwritten notations on the document are illegible, it is clear that on March 31, 2000, Anderson was suffering from vomiting and diarrhea. On this date, Dr. Payne recorded that Anderson was prescribed Phenegran, a drug used to control nausea and vomiting, and was advised to avoid milk products and to take Immodium AD as directed. Dr. Payne indicated that Anderson "will go to ER if she doesn't get any better." (UPCL00008.)

Boothby also emphasized the incomplete nature of Dr. Payne's attending physician form. For example, Boothby noted that, in response to question 12 on this form (*see* UPCL00003 (Ex. to Doc. No. 90)), which states "Patient Work Capacity," Dr. Payne did not place checkmarks in any of the boxes which provided: "sedentary–10 lbs; light–20 lbs; medium–50 lbs; heavy–100 lbs; very heavy-over 100 lbs." (Boothby Dep. at 111–12.)

Similarly, in his "Action Plan," Boothby recites as follows:

claimant is a 32yr old female oow [out of work] since 03/23/2000 due to pregnancy.

---

7. When deposed, Boothby testified that the documentation before him consisted of the items bate stamped UPCL00001—UPCL00013. (Boothby Dep. at 110 (Ex. to Doc. No. 90).) These documents are contained in the record as an exhibit to document number 90 and include Chambers' e-mail, a one-page medical record from Dr. Payne and Anderson's claim form.

AP [attending physician] noted only that the claimant was placed on leave due to past pregnancy history. Genex notes: EE [employee] told the AP that she is unable to perform the duties of her occupation and the ER [employer] will not accom[m]odate. No R & L's [restrictions and limitations] were given by AP. ACOG guide states-may lift safely up to 50 lbs intermittently [sic] until 30 weeks gestation. Dr. Adair states may work 12hr. shifts up to 26 weeks if no complications and an ee may stand greater than 4hrs. until 24 weeks of gestation. Overall, ee is not supported leaving her job at 6+ weeks of gestation on 3/23/200.

(Action Plan, UPCL00082 (attach. A to Doc. No. 90 & Ex. 1 to Doc. No. 93)); (Boothby Dep. at 119 (Ex. to Doc. No. 90).)

The day after receiving Chambers' e-mail, in a letter dated June 23, 2000, Boothby notified Anderson that her claim for disability benefits had not been approved. (*See* UPCL00014–15); (Boothby Dep. at 122 (Ex. to Doc. No. 90).) The denial letter set forth the definition of disability contained in the policy and provided, in pertinent part, as follows:

> Your last day worked was 03/23/2000. The information reviewed by our medical team shows that there are no objective medical findings, in the records on file, that support a level of physical impairment that would prevent you from performing your occupation at 6 weeks gestation. No medical complications were noted to our medical team during a phone call with your attending physician's office. The American College of Obstetrician Gynecologist guidelines state that a person may safely lift up to 50.6 lbs. intermittently until 30 weeks gestation, may work 12 hour shifts up to 26 weeks gestation if there are no complications, and may stand greater than 4 hours until 24 weeks gestation. Upon completion of our review we found no evidence to support impairment from your job starting 3/24/2000 or 6 weeks gestation.

(*See* UPCL00014–15 (Ex. to Doc. No. 90).) In the letter, Boothby also explained the appeal process, set out the 90–day deadline for filing an appeal, and directed that any appeal should be sent to the attention of UnumProvident at the provided address. (*Id.*)

Subsequently, on June 28, 2000, Boothby had a telephone conversation with Anderson, the substance of which he memorialized in a memorandum. Therein, he wrote that he "explained to [Anderson] that Genex had contacted her AP. Her AP did not note any complication and had written her out of work due to prior pregnancy and her word that she can't perform the occ." (*See* UPCL00019.) He continued, "We talked about the ACOG guidelines (50 lbs lifting till 30 wks gestation + 12 hour shifts up to 26 weeks gestation). I explained that there is [sic] no objective medical findings to support her claim of disability at 6 wks gestation" and that her claim "had been denied." (*Id.*) He explained that, if Anderson wanted to appeal, she should do so by letter, as previously outlined to her in his June 23 letter, and that she "may submit any evidence that she thinks will support her claim." (*Id.*)

### 3. *The Denial of Anderson's Appeal*

In a letter dated July 12, 2000, Anderson appealed the decision to deny her claim for disability benefits. (*See* UPCL00022–23 (Ex. to Doc. No. 90).) Anderson's appeal letter stated, in part, as follows:

> I received a letter from your company dated June 23, 2000 concerning my disability claim. In this letter it stated that I had no medical problems that would prohibit me from doing my job. However, I strongly disagree with this decision, and I wish to appeal. I have been

anemic since age thirteen[;] I had gastric-bypass surgery, and a problem pregnancy in 1998. After giving birth to my last child I was diagnosed with cervical dysplasia, and had to have a portion of my cervix removed. I was advised by my OBGYN that I could have problems carrying this child full term. If you need any further assistance concerning these medical conditions, you may contact my physician.

(*See* UPCL00023.) For contact information for her treating physician, Anderson attached a document which contained Dr. Payne's name, address and telephone number.[8] (*See* UPCL00021.)

On July 18, 2000, a "Medical Review Walk–In" form was completed. (UPCL00025 (Ex. to Doc. No. 90).) In its brief, Unum says that this review constituted a "second medical review" of Anderson's claim. (Unum Br. at 12 (Doc. No. 93).) In this form, the reviewer concluded as follows:[9]

Recently received information contains hand written letter by claimant stating she was told by her ob/gyn that she "may have problems carrying this child full term" due to earlier procedure for [treatment] of cervical dysplasia. This statement is M.D. speculation & is not supported [with] objective data in the file that demonstrates problems [with] pregnancy.

(*See* UPCL00025.)

Anderson was advised by letter dated July 18, 2000, that the "additional information" she had provided was insufficient to warrant reversal of the original decision to deny Anderson's claim for benefits. (*See* UPCL00026 (Ex. to Doc. No. 90).) This letter, also authored by Boothby, provided as follows:

We have reviewed the additional information you recently sent us. We regret this information was not sufficient to reverse our previous decision.

As stated in a letter to you on June 23rd, 2000, there are no objective medical findings, in the records on file, that support a level of physical impairment that would prevent you from performing your occupation at 6 weeks gestation. The information received and reviewed does not contain objective medical data that demonstrates problems with your current pregnancy.

This information and your file have been forwarded to the Quality Review Unit in Chattanooga, Tennessee. They will provide an impartial review as provided by ERISA. The Quality Review Unit will contact you when your file is received to explain the appeal process and let you know who will be handling your appeal.

(*See* UPCL00026 (Ex. to Doc. No. 90).)

By letter dated July 27, 2000, Anderson was informed that Marilyn Howard ("Howard") had been forwarded Anderson's "entire claim file and previously submitted medical" documentation for appellate review. (UPCL000031 (Ex. to Doc. No. 90).) Howard stated that, "[o]nce our review begins, you will be contacted if additional information is needed. You will be advised in writing of our final determination."

---

**8.** The letter was written by Dr. Payne to Anderson. In the letter, Dr. Payne references a conversation she had with a CEO at Shaw Industries and states:

It has always been my understanding that the determination of disability in pregnancy was a highly individual decision and could only be made by a physician. It has also been my impression over the years that Shaw Industries was in favor of pregnant wom[e]n going on disability when they felt that they could not perform their jobs. Of course, you and I know how physically demanding the work at Shaw Industries is.

(UPCL00021 (Ex. to Doc. No. 90).)

**9.** Although the form contains the signature of the employee who completed it, the signature is not legible.

(*Id.*) Howard signed the letter and identified herself as an "Appeals Consultant" for UnumProvident Corporation. (Letter, UPCL00031 (Ex. to Doc. No. 90).)

By letter dated July 31, 2000, Howard advised Anderson that "the denial decision was appropriate and has been upheld." (*See* UPCL00032–33 (Ex. to Doc. No. 90).) The letter provided, in pertinent part, as follows:

> In our initial correspondence of June 23, 2000, you were notified that there was [sic] no objective medical findings that support a level of physical impairment that would prevent you from performing your occupation at 6 weeks gestation. No medical complications were noted to our medical team during a phone call with your attending physician's office. The American College of Obstetrician Gynecologist guidelines state that a person may safely lift up to 50.6 lbs intermittently until 30 weeks gestation, may work 12 hour shifts up to 26 weeks gestation. Subsequent to this correspondence, we received your letter of appeal in our office on July 14, 2000 along with additional information. This information was reviewed by our clinical area. They concluded, "Recently received information contains handwritten letter by claimant stating she was told by her OB/GYN that she may have problems carrying this child full term due to earlier procedure for treatment of cervical dysplasia. This statement is MD speculation and is not supported with objective data in the file that demonstrates problems with pregnancy."
>
> Because there is no additional objective information to support your claim, we are upholding the decision as outlined in the initial correspondence from your claim specialist Adam Boothby.
>
> We are sorry that our decision could not be more favorable at this time. If you have additional objective medical documentation, submit it to our office within 30 days for review by our medical department. If we do not receive additional documentation within 30 days, our decision will be final.

(*Id.*) The signature block sets forth Howard's name. (*Id.*)

On August 1, 2000, Herbal faxed to Howard an additional page from Anderson's prenatal record on file with Dr. Payne. (*See* UPCL00035–UPCL00036 (Ex. to Doc. Nos. 90, 93).) The parties have not stated whether this medical record was faxed in response to Howard's statement permitting Anderson to submit additional evidence within 30 days. There, however, is nothing in the record indicating that Howard or another employee ever evaluated this medical record. The medical record, titled "Prenatal Record—History," contains Dr. Payne's notations regarding her treatment of Anderson on June 20, 2000, July 11, 2000, July 24, 2000 and July 26, 2000. (*See* UPCL00035 (Ex. to Doc. No. 90).) The document indicates that on July 24, 2000, Anderson was suffering from vomiting and diarrhea and that, on that day, she was hospitalized and treated intravenously for these pregnancy-related symptoms. (*Id.*)

### E. *Dr. Payne's Deposition*

During her deposition, taken in connection with this lawsuit, Dr. Payne elaborated upon the information provided in her Attending Physician Statement which accompanied Anderson's claim form sent to Unum.[10] Dr. Payne testified that she

---

**10.** Portions of Dr. Payne's deposition are attached as exhibits to document numbers 90, 93 and 94. It is undisputed that the deposition testimony of Dr. Payne was not before Unum's claims administrator when the decision to deny Anderson's claim for disability benefits was made. Whether the court may consider this extraneous evidence is discussed later in this opinion.

deemed Anderson "disabled" as of March 29, 2000, which is the date Dr. Payne first treated Anderson in connection with the pregnancy at issue. (Dr. Payne Dep. at 22–23 (Ex. to Doc. No. 90).) She explained that she made her decision that Anderson was "disabled" while pregnant based upon several considerations, including the following: Anderson's physically strenuous job duties at Shaw Industries; Anderson's job-related fatigue which had been exacerbated by pregnancy[11]; Anderson's history of depression, stress, and migraines; Anderson's physical condition due to a prior gastric bypass procedure which had been a "persistent chronic problem" for Anderson; and her pregnancy-induced nausea and vomiting which ultimately required hospitalization and treatment through prescription medication and intravenous fluids. (Dr. Payne Dep. at 19–20, 24, 63–66, 73–74 (Ex. to Doc. No. 90)); (Dr. Payne Dep. at 11–12 (Ex. to Doc. No. 94).) The fact that, prior to her pregnancy, Anderson had a part of her cervix removed due to a diagnosis of cervical dysplasia, a precancerous condition, also factored into Dr. Payne's decision, although to a lesser degree than the other factors described herein. (Dr. Payne Dep. at 20–21, 64 (Ex. to Doc. No. 90).)

Additionally, Dr. Payne had knowledge of Anderson's prior pregnancy in 1998 during which Anderson similarly had endured hyperemesis, a condition described by Dr. Payne as "unrelenting nausea and vomiting related to pregnancy." (*Id.* at 13.) Dr. Payne recalled that Anderson "suffered greatly" during that pregnancy. (*Id.* at 65.) She indicated that she was aware that Anderson had been placed on leave from her job at Shaw Industries "at early gestation" during the 1998 pregnancy due to hyperemesis and a lack of "physical stamina" to perform her job duties. (*Id.* at 19–20, 64–66.) Furthermore, Dr. Payne recalled one office visit in 1998 where Anderson was in the examination room, curled up in a fetal position with the lights off, "unable to move because of the nausea and/or migraines." (*Id.*)

Dr. Payne also pointed out that, during Anderson's approximate seventh week of pregnancy (the pregnancy which forms the basis of Anderson's ERISA claim in this case), Anderson was admitted to the hospital for two days for intravenous fluids and an intravenous prescription to treat adverse pregnancy symptoms. (*Id.* at 14–15.) Thereafter, periodically during her pregnancy, on at least three occasions, Anderson received additional intravenous treatments at the hospital on an outpatient basis. (*Id.*) Dr. Payne also testified that, pursuant to an ACOG policy statement (which she testified are authoritative), treatment of pregnancy disability involves highly individual decisions and only can be determined by a physician.[12] (*Id.* at 18, 12); (Payne Dep. at 114 (Ex. 2 to Doc. No. 93).)

## F. *The Complaint and the Relief Sought*

The operative complaint is Anderson's First Amended Complaint. (1st Am. Compl.(Doc. No. 40).) Subsequent to the court's finding of ERISA preemption, Anderson filed the First Amended Complaint to comply with the court's order permitting Anderson to amend her Com-

---

**11.** Dr. Payne explained that Shaw Industries requires its employees to work a "swing shift," meaning that employees work each of Shaw Industries' three shifts on a rotating basis. (Dr. Payne Dep. at 25 (Ex. to Doc. No. 94).) The constant change in shifts from day to night, in general, "is associated with chronic fatigue." (*Id.* at 25.)

**12.** The ACOG's policy statement on "pregnancy disability" provides, in part, that "[t]he onset, termination and cause of the disability as related to pregnancy can only be determined by a physician." (*See* Policy Statement (UPCL00027) (Ex. to Doc. No. 90).)

plaint to state a cause of action under ERISA. (*See* Ct. Mem. Op. & Order at 16 (Doc. No. 39).) Therein, Anderson brings her claim under 29 U.S.C. § 1132. (1st Am. Compl.(Doc. No. 40).) Anderson seeks recovery of monthly benefits under the policy in the amount of $983.84 for the period of June 22, 2000, to January 3, 2001, as well as prejudgment interest, attorney's fees and any other relief the court deems proper.[13] (Anderson Br. at 16, 18 (Doc. No. 90)); (*see also* Ex. to Doc. No. 90 (Attachment A at 7)); (1st Am. Compl. at 4 (Doc. No. 40))

In its Answer, Unum admits that Anderson was covered under a Unum group long-term disability policy during the time of the alleged disability made the basis of this lawsuit. (Unum Answer ¶ 5 (Doc. No. 51).) Unum, however, denies that Anderson's pregnancy entitled to her disability benefits under the policy or that it improperly denied her claim. (*Id.* ¶¶ 6, 10.)

## IV. DISCUSSION

It is undisputed that Anderson is a covered beneficiary under a benefits plan which is subject to ERISA. Anderson, thus, may challenge the denial of coverage for long-term disability benefits under 29 U.S.C. § 1132(a)(1)(B).[14] Section 1132(a)(1)(B) provides that a civil action may be brought by a beneficiary, such as Anderson, "to recover benefits due to him [or her] under the terms of his [or her] plan, to enforce his [or her] rights under the terms of the plan, or to clarify his [or

her] rights to future benefits under the terms of the plan[.]" In this litigation, Anderson bears the burden to prove her entitlement to disability benefits under the policy. *Horton v. Reliance Standard Life Ins. Co.*, 141 F.3d 1038, 1040 (11th Cir. 1998).

Three standards of review emerge in ERISA litigation involving § 1132(a)(1)(B) benefits-denial claims: *de novo*, arbitrary and capricious, and heightened arbitrary and capricious. *Williams v. BellSouth Telecommunications, Inc.*, 373 F.3d 1132, 1134–35 (11th Cir.2004). The parties devote considerable argument to the standard and scope of review to be exercised by the court over the benefits-denial decision in this case. Thus, before proceeding to the merits of Anderson's claim, it is necessary for the court to resolve these threshold issues.

A. *Standards of Review: De novo, arbitrary and capricious, heightened arbitrary and capricious; Consideration of Evidence Not Presented to Plan Administrator (Scope of the Record)*

Unum contends that the administrative record before its claims administrator at the time the decision was made is the only record which the court can examine and that, under the multi-step analysis set forth by the Eleventh Circuit in *Williams, supra,* 373 F.3d at 1137, it is entitled to prevail. (Unum Br. (Doc. No. 93).) Anderson, however, contends that the *de novo* standard of review applies, but that the benefits-denial decision cannot be up-

---

**13.** The court notes that, in the First Amended Complaint, Anderson also seeks compensatory and punitive damages. (1st Am. Compl. at 4.) Apparently recognizing that compensatory and punitive damages are not authorized under ERISA, Anderson has not requested or mentioned extra-contractual damages in her brief on the merits. *See, e.g., Godfrey v. Bell-South Telecomm., Inc.,* 89 F.3d 755, 761 (11th Cir.1996) (holding that 29 U.S.C.

§ 1132(a)(1)(B) does not authorize awards of compensatory or punitive damages).

**14.** Although in her First Amended Complaint, Anderson does not reference any particular statutory subsection of 29 U.S.C. § 1132 (1st Am. Compl.(Doc. No. 40)), it is clear that Anderson proceeds under 29 U.S.C. § 1132(a)(1)(B).

held no matter what standard of review is applied. (Anderson Reply at 15 (Doc. No. 90).) As to the scope of review, Anderson contends that regardless of which standard the court applies—*de novo,* heightened arbitrary and capricious, or arbitrary and capricious—the court is not confined to the administrative record which was before the claims administrator when it denied her claim. (*Id.* at 8.)

### 1. The Three Standards of Review Applicable in ERISA Denial–of–Benefits Determinations

As recognized by the Eleventh Circuit in *Moon v. American Home Assurance Co.,* the Supreme Court of the United States has established that a court reviews *de novo* a claim for denial of benefits pursuant to 29 U.S.C. § 1132(a)(1)(B) " 'unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan.' " 888 F.2d 86, 88 (11th Cir.1989) (quoting *Firestone Tire & Rubber Co. v. Bruch,* 489 U.S. 101, 109 S.Ct. 948, 103 L.Ed.2d 80 (1989)). The Eleventh Circuit "has interpreted *Bruch* to mandate *de novo* review unless the plan expressly provides the administrator discretionary authority to make eligibility determinations or to construe the plan's terms." *Kirwan v. Marriott Corp.,* 10 F.3d 784, 788 (11th Cir.1994). The *de novo* standard of review "offers the highest scrutiny," because "no deference" is accorded to the administrator's decision. *Williams,* 373 F.3d at 1137. In the Eleventh Circuit, "a district court conducting a *de novo* review of an Administrator's benefits determination is not limited to the facts available to the Administrator at the time of the determination." *Kirwan,* 10 F.3d at 789.

When, however, the administrator has discretionary authority under the plan, the decision to deny benefits is reviewed under the arbitrary and capricious standard of review. To trigger arbitrary and capricious review, "the plan documents at issue [must] explicitly grant the claims administrator discretion to determine eligibility or construe terms of the plan." *HCA Health Servs. of Georgia, Inc. v. Employers Health Ins. Co.,* 240 F.3d 982, 993 (11th Cir.2001) ("HCA"). Under this standard which parallels the abuse of discretion standard, *see id.,* "the function of the court is to determine whether there was a reasonable basis for the decision based upon the facts as known to the administrator at the time the decision was made." *Jett v. Blue Cross & Blue Shield of Alabama, Inc.,* 890 F.2d 1137, 1139 (11th Cir.1989); *see also Paramore v. Delta Air Lines, Inc.,* 129 F.3d 1446, 1450 n. 2 (11th Cir.1997). As explained in *Leahy v. Raytheon Co.,* under the abuse of discretion standard, "in a very real sense, the district court sits more as an appellate tribunal than as a trial court. It does not take evidence, but, rather, evaluates the reasonableness of an administrative determination in light of the record compiled before the plan fiduciary." 315 F.3d 11, 17–18 (1st Cir.2002). The court applies this standard "to avoid judicial second guessing/intrusion by according the most judicial deference (and thus, the least judicial scrutiny)." *Williams,* 373 F.3d at 1137.

A third standard of review, described as the "heightened arbitrary and capricious standard," requires "a level of deference (and conversely, scrutiny) somewhere between what is applied under the *de novo* and 'regular' arbitrary and capricious standards." *Id.* Application of this standard of review is triggered "where the administrator has discretion but exercises it under a conflict of interest." *Id.* For instance, when the claims administrator both funds and administers its disability plan or, stated differently, it pays the ben-

efits it administers, there exists an inherent conflict of interest between the claims administrator's fiduciary role and profit-making interest. *See Brown v. Blue Cross and Blue Shield of Alabama, Inc.,* 898 F.2d 1556, 1563 (11th Cir.1990). "Under the heightened arbitrary and capricious standard of review, the burden shifts to the claims administrator to prove that its interpretation of the plan is not tainted by self-interest." *HCA,* 240 F.3d at 994; *Brown,* 898 F.2d at 1563. "The claims administrator satisfies this burden by showing that its wrong but reasonable plan benefits the class of participants and beneficiaries." *Levinson v. Reliance Standard Life Ins. Co.,* 245 F.3d 1321, 1326 (11th Cir.2001). The scope of review generally is limited to "the facts as known to the administrator at the time the decision was made." *Id.*

█ While ERISA places the burden upon Anderson to prove an entitlement to disability benefits under the policy, *see Horton,* 141 F.3d at 1040, Unum bears the burden of proving that the arbitrary and capricious standard of review applies. *See Fay v. Oxford Health Plan,* 287 F.3d 96, 104 (2nd Cir.2002); *Sharkey v. Ultramar Energy Ltd.,* 70 F.3d 226, 229 (2nd Cir. 1995) (holding that fiduciary bears burden of proof on issue of standard of review "since the party claiming deferential review should prove the predicate that justifies it"). Furthermore, "whether an insurance plan grants discretionary authority to a plan administrator" presents a question of law. *Tiemeyer v. Community Mut. Ins. Co.,* 8 F.3d 1094, 1099 (6th Cir.1993).

#### (a) The Arguments of the Parties: Standard of Review

With the foregoing principles in mind, the court turns to the arguments of Anderson and Unum as to which standard of review is applicable in this case. As stated, courts look to the language of the plan documents to determine whether a claims administrator is vested with the discretionary authority to make benefits-eligibility determinations so as to trigger an arbitrary and capricious standard of review. Here, the Certificate Section of the policy provides that, "[w]hen making a benefit determination under the policy, Unum [Life Insurance Company of America] has discretionary authority to determine your eligibility for benefits and to interpret the terms and provisions of the policy." (UPCL000061 (Ex. 1 to Doc. No. 93) ("Certificate Section") (brackets added).)

Unum contends, and Anderson agrees, that the foregoing policy language confers an express grant of discretionary authority upon Unum to determine Anderson's eligibility for benefits under the policy, thus, triggering the deferential arbitrary and capricious standard of review as to benefits determinations made by Unum. The court concurs. *See HCA,* 240 F.3d at 995 (policy language providing that claims administrator had "discretionary authority to ... interpret policy provisions" and "make decisions regarding eligibility for coverage and benefits" conferred requisite discretion, rendering *de novo* review inapplicable); *Risher v. Unum Life Ins. Co.,* No. CV204–130, 2005 WL 1983769, *3 (S.D.Ga. Aug. 16, 2005) (finding policy language identical to that in the policy at issue in this case granted Unum discretion to interpret disputed terms).

At this point, however, the parties proffer divergent positions. Anderson contends that the employees involved in the decision-making concerning the denial of her claim for long-term disability benefits and her appeal of that denial were Boothby and Howard, both of whom identify themselves as UnumProvident employees, not Unum employees. Anderson argues that UnumProvident is the "deciding

body" and that, therefore, the policy must provide an express grant of discretionary authority to UnumProvident in order for the arbitrary and capricious standard of review to apply. The policy, however, refers only to Unum's discretionary authority to determine eligibility for benefits, not UnumProvident's; therefore, Anderson argues that the *de novo* standard of review governs in this case. (Anderson's Br. at 3, 4–5 (Doc. No. 90).)

Unum, on the other hand, states that Anderson's "only support for that argument is her unsupported assertion that 'it is uncontroverted that the persons who made the decision to deny benefits are [UnumProvident] employees.'" (Unum Br. at 13 n. 6 (Doc. No. 93).) Unum says that, "[s]upposing that unsupported assertion is true, [UnumProvident] was not the deciding body, Unum was." (*Id.*) "Unum issued the policy ..., made the decision to deny [Anderson's] claim for disability benefits, and will be liable on [Anderson's] claim should the court decide in [Anderson's] favor." (*Id.*)

### (b) Analysis

From Anderson's theory emerges a pivotal and important issue of which entity— Unum or UnumProvident—made the decision to deny Anderson's claim. *See Sharkey,* 70 F.3d at 229 ("[t]he factual issue of who actually made the benefit determination must be resolved before a court can properly decide whether or not to uphold the [benefits] determination"). Unum is entitled to a deferential standard of review, whether that standard is the heightened one or the more deferential arbitrary and capricious standard of review, only if it, or an *authorized party,* made the challenged benefits determination. On the other hand, if an unauthorized party made the benefits determination, the denial of plan benefits is reviewed under the *de novo* standard. *See Rodriguez–Abreu v. Chase Manhattan Bank,* 986 F.2d 580, 584 (1st Cir.1993); *see also Mazzacoli v. Continental Cas. Co.,* 322 F.Supp.2d 1376, 1381 (M.D.Fla.2004) ("Eleventh Circuit precedent is clear that where an unauthorized party denies plan benefits, that denial is reviewed under the *de novo* standard.") (citing *Baker v. Big Star Div. of the Grand Union Co.,* 893 F.2d 288, 291 (11th Cir. 1989)).

■ An authorized party is one who has received a proper delegation of powers. Pursuant to 29 U.S.C. § 1105, a plan administrator may delegate its fiduciary duties to a third party if the plan provides a clear process for such delegation.[15] As aptly explained by the First Circuit, 29 U.S.C. § 1105 "allows named fiduciaries to delegate responsibilities ... through express procedures provided in the plan. To be an effective delegation of discretionary authority so that the deferential standard of review will apply, therefore, the fiduciary must properly designate a delegate for the fiduciary's discretionary authority." *Rodriguez–Abreu,* 986 F.2d at 584.

■ The parties have not cited, and the court has not found, a published opinion from the Eleventh Circuit Court of Appeals explicitly addressing what constitutes a proper delegation. Other courts, however, applying 29 U.S.C. § 1105, have concluded that a third-party administrator's denial of a claim for ERISA benefits is subject to review under the arbitrary and capricious standard of review, and not *de novo* review, only where the plan gives the claims administrator discretionary authority to decide eligibility for benefits *and*

---

**15.** Section 1105 of ERISA provides, in part, that "the instrument[s] under which a plan is maintained may expressly provide for procedures ... for named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary responsibilities." 29 U.S.C. § 1105.

provides the claims administrator express authority to delegate its discretionary authority as to coverage decisions to third parties. *See Madden v. ITT Long Term Disability Plan*, 914 F.2d 1279, 1283–84 (9th Cir.1990); *Leonhardt v. Holden Business Forms Co.*, 828 F.Supp. 657, 665 (D.C.Minn.1993); *Lloyd v. Evangeline Health Care, Inc.*, No. 5:96cv4–V, 1999 WL 33117256 (W.D.N.C. March 31, 1999).

For example, in *Lloyd*, the court found that the ERISA policy permitted delegation because it provided that the plan administrator had the "final authority to control and manage the operation and administration of the Plan" and that the administrator had the power to "delegate . . . all or a portion of the responsibilities for the operation and administration of the Plan" and the right to "interpret[ ] . . . the terms and conditions of the Plan." 1999 WL 33117256, at *5. The Eleventh Circuit's decision in *Slomcenski v. Citibank, N.A.*, 432 F.3d 1271 (11th Cir.2005), is not inconsistent with *Lloyd* and the foregoing opinions. In *Slomcenski*, although delegation of claims administration duties was not at issue, the Eleventh Circuit implicitly recognized that the ERISA plan which provided that the plan administrator could delegate "some or all of its responsibilities as it deemed appropriate" triggered the arbitrary and capricious standard of review as to the benefits decision made by a delegated third-party claims administrator. *See id.* at 1271, 1280.

Conversely, where decisions to deny benefits have been made by third parties who did not have explicit discretionary authority pursuant to a delegation of powers in the plan provisions, courts have reviewed coverage determinations *de novo*. *See Sanford v. Harvard Indus., Inc.*, 262 F.3d 590, 597 (6th Cir.2001) ("When an unauthorized body that does not have fiduciary discretion to determine benefits eligibility renders such a decision . . . deferential review is not warranted."); *Sharkey*, 70 F.3d at 229 (holding that "[w]here an unauthorized party makes the [challenged benefit] determination, a denial of plan benefits is reviewed under the *de novo* standard"). In *Davidson v. Liberty Mutual Insurance Co.*, the court found that the ERISA plan contained sufficient language to invoke the arbitrary and capricious standard of review as to benefits decisions made by Liberty Mutual, but found that, absent evidence of an express delegation of duties in the plan, Liberty Mutual's delegation of duties to Liberty Life mandated application of the *de novo* standard of review. 998 F.Supp. 1, 8 (D.Me.1998). The court explained:

The delegation of fiduciary duties, such as those of plan administrator, may in some instances trigger *de novo* review rather than the deferential arbitrary and capricious standard of review. According to ERISA, "[t]he instrument under which a plan is maintained may expressly provide for procedures . . . for named fiduciaries to designate persons other than named fiduciaries to carry out fiduciary responsibilities (other than trustee responsibilities) under the plan." 29 U.S.C. § 1105(c)(1). "To be an effective delegation of discretionary authority so that the deferential standard of review will apply, . . . the fiduciary must properly designate a delegate for the fiduciary's discretionary authority." *Rodriguez–Abreu*, 986 F.2d at 584. The parties have not provided any portion of the LTD [long-term disability] plan which indicates that the plan expressly permits delegation of the duties of the plan administrator. Because the Court cannot assume that the LTD plan permitted delegation of the duties of the plan administrator in satisfaction of 29 U.S.C. § 1105(c), the Court will apply the *de novo* standard of review to the

out-of-court decisions made by Liberty Life.

*Id.* at 8–9 (internal footnote omitted) (brackets added).

The court, thus, must decide (1) which of the two entities—Unum or UnumProvident—decided Anderson's claim and (2) if UnumProvident was the deciding body, whether UnumProvident was authorized by the Unum plan documents to make that decision.[16]

As to the first issue, Anderson's argument that the decision-making entity was UnumProvident, not Unum, finds support from several evidentiary sources. First, Anderson has submitted the General Services Agreement entered into between UnumProvident and Unum to demonstrate that UnumProvident, not Unum, is the entity which made the decision to deny her claim. (*See* General Services Agreement (Ex. to Doc. No. 94).) In this contractual document, UnumProvident and Unum have agreed that UnumProvident will review claims submitted by individuals insured under Unum policies and will decide whether the claims are payable. (*Id.*) The court is unaware of any contractual terms in the Agreement, and none have been identified by Unum, by which Unum "reserved the right to review" benefits-eligibility decisions such that it could be argued that Unum retained the ultimate authority to approve or deny claims and, thus, exercised its discretionary authority under the plan. *Baker*, 893 F.2d at 290–91.

Second, as to Anderson's claim, the evidence reveals that Unum and UnumProvident adhered to their Agreement. Namely, Boothby and Howard, the ones who made the determination to deny Anderson's claim and to reject her appeal of that denial, explicitly have identified themselves as employees of UnumProvident in all of the correspondence they mailed to Anderson and have testified to the same. The letterhead on their correspondence to Anderson also is preprinted with UnumProvident's name and address. (*See* UPCL000034, UPCL000033, UPCL000031, UPCL000029, UPCL00028, UPCL000026); (Anderson Reply at 2–3 (Doc. No. 94).) Relatedly, there is no evidence that Boothby or Howard worked under the direction, control or supervision of Unum, and no argument to that effect has been made by Unum. In fact, the Agreement confirms that UnumProvident's employees operate independently without influence from Unum. Namely, it expressly provides that UnumProvident "maintain[s] the exclusive right to exercise discretion and control over [its] associates" and that it performs its duties for Unum as an "independent contractor, and not as the employee, partner or agent of [Unum]." (*See* General Services Agreement, ¶ 1.4 & 9 (Ex. to Doc. No. 94).) There is no evidence indicating that Unum acted contrary to this provision of the Agreement concerning Anderson's claim for benefits.

Third, in the letter from Boothby denying Anderson's claim, Boothby directed Anderson to mail her appeal request to "UnumProvident," not Unum. (UPCL000028.) This evidence further confirms that UnumProvident is not only the corporate body which initially denied

---

**16.** There is no evidence in the record indicating that Unum and UnumProvident should be treated as anything other than two separate entities. *See, e.g., Univ. Medical Assoc. of Medical Univ. of S.C. v. UnumProvident Corp.,* 335 F.Supp.2d 702, 707–08 (D.S.C.2004); (*see also* General Services Agreement at 9 (Ex. to Doc. No. 94) ("The parties agree that UNUM-Provident is engaged in an independent business and will perform its obligations under this Agreement as an independent contractor and not as the employee, partner or agent of [Unum]."))

Anderson's claim, but also is the entity which reviewed Anderson's appeal.

In light of the foregoing evidence, the court is perplexed as to why Unum makes a blanket assertion that Anderson's contention that UnumProvident was the deciding entity is "unsupported." (Unum Br. at 13 n. 6 (Doc. No. 93).) Unum's evidence to support its statement is virtually nonexistent. Relying on the policy as its evidentiary support, Unum points out that, as reflected in the policy, it is the entity which issued Anderson the policy and which possessed discretionary authority to decide whether to pay her claim for benefits. (*Id.*) These policy terms, however, simply do not speak to the issue of whether or not Unum actually retained its authority to make claims determinations. Moreover, the court disagrees that Unum is attempting "to change the identity of the Defendant" at the eleventh hour of this litigation.[17] (*See id.* at 1 n. 1.) The court only understands Anderson to argue that Unum is not entitled to discretionary review for a decision it never made.

Unum has not presented any evidence to refute Anderson's evidence that Unum had no involvement in the decision-making process pertaining to the review and denial of Anderson's claim for benefits. To the extent that there exists evidence to the contrary, Unum bears the responsibility for its absence in the record because UNUM is the party which is advocating deferential review. *Fay,* 287 F.3d at 104; *see also Sharkey,* 70 F.3d at 229 (holding that fiduciary bears burden of demonstrating that it is the party that actually made the decision to deny claim for benefits "since the party claiming deferential review should

prove the predicate that justifies it"). In sum, the court concludes that the only finding which the evidence supports is a finding that UnumProvident had autonomous control over the decision regarding Anderson's eligibility for benefits under the policy.

As discussed above, the mere fact that the entity vested with discretionary authority does not make the decision concerning the denial of a claim for benefits is not necessarily fatal to the application of an arbitrary and capricious standard of review. As stated, ERISA permits delegation of coverage determinations to third parties, provided that the plan documents give the named claimed administrator the express authority to do so.

 Here, by virtue of the General Services Agreement, Unum has, in fact, made a delegation to UnumProvident to decide eligibility of claims under Unum policies and, as the court found above, consistent with that Agreement, UnumProvident made the decision to deny Anderson's claim for benefits. The plan documents, however, must in the first instance give Unum the power to delegate those duties before Unum can invoke the arbitrary and capricious standard of review. The court has not found, and the parties have not pointed to, any language in the policy which grants Unum authorization to delegate any of its discretionary authority to a third party. *Contrast Madden,* 914 F.2d at 1284 (concluding that plan provision that administrator "may delegate" its authority complied with 29 U.S.C. § 1105(c)(1)'s procedural requirement); *Lee v. MBNA Long Term Disability &*

---

17. The court notes that, although as pointed out by Unum (Unum Br. at 1 n. 1 (Doc. No. 93)), the identity of the defendant has been the source of some confusion, no argument has been made that Unum is not a proper defendant in this case. *See e.g., Burchill v.*

*UnumProvident Corp.,* No. 03–67–P–S, 2003 WL 21524730 (D.Me. June 27, 2003) (agreeing with UnumProvident that insured's "claim to recover benefits from a policy-funded plan is properly directed toward the actual insurer-administrator, Unum Life").

*Benefit Plan,* 136 Fed.Appx. 734, 742–43 (6th Cir.2005) (unpublished opinion) (holding that plan document permitting plan administrator to delegate its authority "in contracts, letters, and other documents" and permitting re-delegation when "allowed" by plan administrator sufficiently specified the "procedure" for delegation under 29 U.S.C. § 1105(c)(1)). The court, thus, finds that there is no evidence in any "instrument under which [the] plan is maintained," 29 U.S.C. § 1105(c)(1), which gave Unum the authority to delegate its claims-eligibility decisions to third parties.

In sum, the court finds that the undisputed evidence establishes that UnumProvident is the entity which made the benefits-denial decision in Anderson's case, but that Unum did not have authority under the terms of the policy to delegate its claims-decision responsibilities to Unum-Provident. Consequently, UnumProvident does not share the same discretionary authority as Unum to determine eligibility for benefits under Unum's policies, and, thus, the court finds that the decision to deny Anderson's claim for benefits is subject to the *de novo* standard of review.

### 2. Scope of the Record for Review

█ The court's conclusion that the *de novo* standard of review applies does not end the procedural controversy, because the parties also disagree whether, under this standard, the evidentiary scope of the court's review may include evidence which was not before the claims administrator at the time the decision to deny benefits was made. During the course of these proceedings, Unum has maintained that the court must confine its review to the facts before the claims administrator when the

decision to deny Anderson's benefits was made. Namely, in a prior pleading, Unum relied upon *Donatelli v. Home Insurance Co.,* 992 F.2d 763 (8th Cir.1993), in which the Eighth Circuit held that expansion of the factual record upon *de novo* review should be permitted only in certain demarcated circumstances. (*See* Unum Mot. for Order Requiring Case to Be Tried on Briefs at 2 n. 1) (Doc. No. 55). As Anderson correctly has pointed out, however, in *Kirwan,* the Eleventh Circuit did not align itself with the Eighth Circuit.[18] *See* 10 F.3d at 789 & n. 31. Imposing no restrictions, the Eleventh Circuit held that "a district court conducting a *de novo* review of an Administrator's benefits determination is not limited to the facts available to the Administrator at the time of the determination," but instead can consider evidence regarding an individual's disability which was in existence at the time the plan administrator's decision was made, even though this evidence was not made available to the administrator. *See id.; see also Shaw v. Connecticut General Life Ins. Co.,* 353 F.3d 1276, 1284 n. 6 (11th Cir.2003) ("As a rule, *de novo* review permits the parties to put before the district court evidence beyond that which was presented to the administrator at the time the denial decision was made.") (citing *Moon,* 888 F.2d at 89 ("American Home's contention that a court conducting a *de novo* review must examine only such facts as were available to the plan administrator at the time of the benefits denial is contrary to the concept of a *de novo* review.")); *see also Whatley v. CNA Ins. Cos.,* 189 F.3d 1310 (11th Cir.1999) (applying *de novo* review).

---

**18.** In *Kirwan,* the Eleventh Circuit recognized the split among the circuits as to the scope of the record a court can examine on *de novo* review. *See* 10 F.3d at 789 n. 31. The court observes that, presently, the Second, Third, Fourth, Fifth, Seventh, Eighth and Ninth Circuits allow the introduction of evidence outside of the administrative record, but only in specified and limited circumstances. *See Hall v. Unum Life Ins. Co. of America,* 300 F.3d 1197, 1201–1202 (10th Cir.2002) (collecting cases).

Upon *de novo* review then, the court is permitted to expand the administrative record to include evidence which was not before the claims administrator when the decision to deny benefits was made. The court, thus, rejects Unum's reliance on *Donatelli* as authority for restricting the record which the court can review. Based upon the Eleventh Circuit's holding in *Kirwan*, the court finds that it may consider facts which were available, but not presented, to the administrator at the time of the coverage determination. Here, the controversial evidence consists of the opinions rendered by Dr. Payne during her deposition testimony. Because Dr. Payne's opinions were available at the time the claims administrator's decision, the court has considered them, in addition to record before the claims administrator at the time the coverage decision was made.

3. *Unum's reliance on the Eleventh Circuit's review procedure set forth in Williams v. BellSouth Telecommunications, Inc., 373 F.3d 1132 (11th Cir. 2004)*

As a final procedural matter, the court observes that Unum devotes the entirety of its legal analysis to the application of the judicial procedure outlined by the Eleventh Circuit in *Williams*, cited above (*See* Unum Br. at 8–18 (Doc. No. 93).) Given Unum's reliance on *Williams*, the court finds that, before proceeding to the merits, it is appropriate for the court to articulate why it finds that *Williams* does not apply in this case.

In *Williams*, after reviewing the three standards of review applicable to denial of benefits claims (i.e., *de novo*, arbitrary and capricious, and heightened arbitrary and capricious), the Eleventh Circuit "recapitulate[d]" and "simpl[ified]" the multi-step procedure of judicial review which it first articulated in *HCA, supra.* 373 F.3d at 1137 (citing *HCA,* 240 F.3d at 993–95). The *Williams* procedure delineates six steps. Each of the six-steps in *Williams,* however, presupposes that the claims administrator has an inherent conflict of interest because it both funds and determines eligibility of claims under the plan. *Williams,* therefore, has been referred to as the "modified" or "heightened" standard of review employed for the purpose of accounting for this possible conflict of interest. *House v. Life Ins. Co. of North America,* 399 F.Supp.2d 1254, 1261 n. 2 (N.D.Ala.2005); *Shahpazian v. Reliance Standard Life Ins. Co.,* 388 F.Supp.2d 1368, 1373 (N.D.Ga.2005) (referring to *Williams* analysis as the "heightened arbitrary capricious standard of review").

Unum's assertion that "it has a conflict of interest because it pays claims out of its own assets" (Unum Br. at 16 (Doc. No. 93)) does not trigger application of the *Williams* analysis because the court has found that Unum was not the entity which made the eligibility determination in this case. That entity was UnumProvident. The policy, however, did not give Unum the authority to delegate claims determinations to UnumProvident; thus, in this case, the court finds that the decision to deny benefits is reviewed *de novo* within the meaning of *Kirwan, supra.* As such, the multi-step analysis in *Williams* is inapposite.

Although the court has determined that the *Williams* analysis is inapplicable, the court pauses to distinguish some language in *Williams* which, at first blush, may appear to run contrary to this court's finding that *de novo* review permits the court to review evidence outside of the administrative record. The first step of the *Williams* analysis delineates that courts should "[a]pply the *de novo* standard to determine whether the claim administrator's benefits-denial decision is 'wrong' (i.e., the court disagrees with the administrator's decision)[.]" *Id.* at 1138. Al-

though the scope of the record for review was not at issue in *Williams*, close inspection reveals that the *Williams'* de novo "wrong" inquiry is limited to a review of the evidence which was before the decision-maker at the time the decision was made. *See HCA*, 240 F.3d at 993 n. 23 (discussing origin of this circuit's use of "wrong" and collecting cases which applied that standard); *Richards v. Hartford Life and Accident Ins. Co.*, 356 F.Supp.2d 1278, 1285 (S.D.Fla.2004) (to prove that claims administrator's decision was "wrong" under *Williams, supra*, and *HCA, supra*, plaintiff "must demonstrate that the administrative record as it existed at the time of [administrator's] decision to deny benefits contains evidence that demonstrates her inability to perform the essential duties of her occupation"), *aff'd*, 153 Fed.Appx. 694 (11th Cir.2005) (unpublished opinion); *Ethridge v. Metropolitan Life Ins. Co.*, 2005 WL 3115291, \*7 (M.D.Ga.2005) (insurance company both insured benefits and served as claims administrator; thus, under *Williams, supra*, court assessed whether denial was "*de novo* wrong" based on "the record [insurance company] had before it during the period for which [insured] sought to receive LTD benefits").

At first glance, the "*de novo* wrong" review employed in *Williams, supra*, and *HCA, supra*, appears to conflict with the *de novo* standard of review articulated in *Kirwan* which permits the introduction of factual evidence which was not before the claims administrator at the time of its decision to deny benefits. Another district court in this circuit, however, aptly has explained the different meanings of the term "*de novo*" employed by the Eleventh Circuit in evaluating ERISA benefits decisions.

After describing as "confusing" the Eleventh Circuit's inclusion of the term "*de novo* wrong" into the first-step of the HCA, *supra*, analysis, the court in *Hawkins v. Arctic Slope Regional Corporation*, reconciled *HCA, supra*, and *Kirwan, supra*, deducing that in this circuit "*de novo*" has two different usages in the context of ERISA. *See* 344 F.Supp.2d 1331, 1335 n. 6 (M.D.Fla.2002). It explained: "When using '*De novo*' as a standard of review, courts in this circuit are not limited to the administrative record." *Id.* (citing *Kirwan*, 10 F.3d at 790 and *Luby v. Teamsters Health, Welfare, & Pension Trust Funds*, 944 F.2d 1176, 1184 (3rd Cir.1991)). "'*De novo*' may also mean that [the] court reviews the denial based upon the administrative record without deference or any presumption of correctness." *Id.* "In determining whether a claims administrator's decision is 'wrong,' courts in this circuit may only consider the administrative record." *Id.* (citing *Lee v. Blue Cross/Blue Shield of Alabama*, 10 F.3d 1547, 1550 (11th Cir.1994)). The *Hawkins* court concluded that "the use of the term *de novo* in determining whether a claims administrator is 'wrong,' apparently means in this circuit that the court reviews the denial without deference or any presumption of correctness based upon the administrative record alone, without considering any extrinsic evidence." *Id.; see also Parness v. Metropolitan Life Ins. Co.*, 291 F.Supp.2d 1347 (S.D.Fla.) (rejecting insured's argument that under "*de novo* wrong" prong of the HCA multi-step "heightened arbitrary and capricious standard of review," court could consider evidence outside the record, concluding that insured had confused first step of HCA with "the *de novo* review applied by a court when the plan administrator is not vested with discretionary authority under which the Court may consider evidence outside the administrative record"), *overruled on different grounds by Torres v. Pittston Co.*, 346 F.3d 1324 (11th Cir.2003).

The court agrees with the reasoning of the court in *Hawkins*. Without recogniz-

ing a distinction between the meanings of the Eleventh Circuit's usage of the term *"de novo"* in *Kirwan* and in *Williams /HCA*, it is impossible to reconcile the holdings of these opinions as to the scope of the record which the court can examine upon *de novo* review.[19] Having explained why the *Williams'* multi-step review process does not apply in this case, the court now turns to the merits of the case.

## B. *The Merits*

On the merits, Anderson's primary argument is that, pursuant to *de novo* review, the evidence before the court, including Dr. Payne's deposition testimony, establishes that Anderson was "disabled" within the meaning of the policy from June 22, 2000, to January 3, 2001.[20] Anderson, therefore, contends that Unum's decision to deny her benefits during this time period was erroneous. Focusing on the alleged lack of evidence as to the inception of Anderson's "disability," UNUM complains that Anderson has failed to demonstrate "a level of physical impairment that would have prevented her from performing her occupation at six weeks gestation." [21] (Unum Br. at 4 (Doc. No. 93).)

Under the terms of the policy, Anderson is considered "disabled" only if while insured she became "limited," because of sickness (i.e., pregnancy-related complications), to "perform[ ] the material and substantial duties" of her job as a color sampler, was so limited during her elimination period, and suffered a loss of 20% or more of indexed monthly earnings. (*See* UPCL00037, UPCL0038, UPCL00039, UPCL00040, UPCL00057, UPCL00069 (Ex. to Doc. No. 93).)

■ The dispute in this case centers on whether Anderson has demonstrated that her pregnancy rendered her unable to perform the material and substantial duties of her job. (*See* Unum Br. at 9–13 (Doc. No. 93).) The court is cognizant that, in the usual case, pregnancy would not amount to a disability as defined under the policy; however, in this case, Dr. Payne has rendered a medical opinion that Anderson's physical condition during her pregnancy was anything other than usual.

Dr. Payne determined that Anderson was disabled by virtue of her pregnancy complications from March 29, 2000, to January 3, 2001.[22] (Attending Physician

**19.** The court notes that, notwithstanding the language in *Williams* that courts should employ the six-step procedure in "reviewing virtually *all* ERISA-plan benefit denials," 373 F.3d at 1137, the court finds that this case in not one which falls within that command given the applicability of the *Kirwan de novo* standard of review. Rather, based on the foregoing discussion, it appears that "all" refers to all cases where the entity making eligibility determinations is paying claims out of its own operating assets.

**20.** The policy contains a 90–day elimination period during which a claimant must be disabled before he or she is eligible for benefits under the policy. (UPCL00057.) The requirement of the completion of the 90–day elimination period accounts for the reason Anderson requests benefits beginning on June 22, 2000. As discussed herein, however, the court finds that the actual date upon which

Anderson satisfied the elimination period is June 26, 2000, meaning that she is entitled to benefits beginning on June 27, 2000.

**21.** Anderson was approximately six to seven weeks pregnant when Dr. Payne determined on March 29, 2000, that Anderson was "disabled." (Dr. Payne Dep. at 22–23 (Ex. to Doc. No. 90)); (*see* UNUM Br. at 4 n. 2 (Doc. No. 93).)

**22.** Dr. Payne's determination as to the length of time of Anderson's "disability" included a period of disability following Anderson's labor and delivery. Dr. Payne's finding is consistent with the ACOG policy statement on pregnancy disability which provides that, even in an "uncomplicated pregnancy," labor, delivery and the puerperium generally results in a postpartum period of disability of six to eight weeks. (*See* Policy Statement (UPCL00027) (Ex. to Doc. No. 90).) The court also ob-

Statement (UPCL00003 (Ex. to Doc. No. 90)); (Dr. Payne's Dep. at 22–23 (Doc. No. 90).)) During her deposition, Dr. Payne clearly described Anderson's pregnancy prognosis and concluded that the demanding, physical requirements of Anderson's job and the fatigue caused by working 12-hour, swing shifts were more than Anderson could handle in light of her symptoms which were related to and exasperated by pregnancy. (Dr. Payne Dep. at 64 (Ex. to Doc. No. 90); (Dr. Payne Dep. at 25–27 (Ex. to Doc. No. 94).)) Determining that as of March 29, 2000 Anderson was "disabled," (Dr. Payne Dep. at 22–23 (Ex. to Doc. No. 90)), Dr. Payne considered the totality of Anderson's physical condition arising from the pregnancy itself, such as Anderson's hyperemesis, as well as the effect that Anderson's other medical problems had on her pregnancy, such as Anderson's gastric bypass procedure and cervical dysplasia. Dr. Payne also had knowledge of similar complications during Anderson's prior pregnancy, particularly the debilitating effects of nausea and vomiting that Anderson had experienced. (Dr. Payne Dep. at 13 (Ex. to Doc. No. 90).)

Dr. Payne explained that, during the pregnancy at issue, Anderson suffered nausea and vomiting which required treatment through prescription medication, hospitalization and intravenous fluids. (Dr. Payne Dep. at 14–15, 64 (Ex. to Doc. No. 90).) As noted by Dr. Payne, although in April 2000, Anderson was hospitalized for two days and prescribed Phenegran, a drug used to control nausea and vomiting, her condition did not substantially improve because Anderson was hospitalized at least three times thereafter and treated intravenously for diarrhea and vomiting. (*Id.*)

Although the medical documentation which was before the claims administrator is arguably sparse, the court finds that there is no evidence therein which contradicts the medical opinions given by Dr. Payne during her deposition. The e-mail sent from Chambers to Boothby confirms that Chambers knew that Anderson, at the very least, suffered from "some hyperemesis" and had been hospitalized as a result of this diagnosis. (UPCL00013 (Ex. to Doc. No. 90).) Moreover, the two pages of medical charts in the record indicate that, on March 31, 2000, and July 24, 2000, Anderson was suffering from vomiting, as well as diarrhea, and had been prescribed anti-nausea medication intravenously. (*See* UPCL00008, UPCL00035 (Exs. to Doc. No. 90).)

■■■■ Notwithstanding the foregoing conclusions rendered by Dr. Payne, Unum challenges her opinions on two grounds. First, Unum argues that Anderson fails to demonstrate that she was unable to perform the "material and substantial duties" of her job because she never sought a modification of her job duties. (Unum Br. at 4 (Doc. No. 93)); (*see* UPCL00039, defining "material and substantial duties" as those "duties that … are normally required for the performance of your regular occupation; and cannot be reasonably omitted or modified"). The court, however, disagrees that Anderson's failure to seek a modification of job duties is fatal to a finding of disability. Because Dr. Payne determined that Anderson was unable to work in any capacity, any request by Anderson to seek light duties or other modification would have been futile. Namely, in the Attending Physician Statement submitted with Anderson's claim form, Dr. Payne provided that Anderson "was medically unable to work," had not "been released to work" in her occupation or "in *any* occupation" and would not be able to return to work until January 3, 2001. (UPCL00003 (emphasis added).)

---

serves that Unum has not raised any challenge to the January 3, 2001 date upon which

Dr. Payne concluded that Anderson would be able to return to her job at Shaw Industries.

Dr. Payne confirmed during her deposition that it was her opinion that Anderson was unable to work at Shaw Industries or in "any other occupation." (Dr. Payne Dep. at 11 (Ex. to Doc. No. 94).) As stated by the court in *Sprenkle v. Hartford Life Insurance Co.*, "[a] medical doctor's opinion that a person should not work means, simply stated, that the person should not work." 84 F.Supp.2d 751, 756 (N.D.W.Va. 2000).

 Second, Unum suggests that Dr. Payne's medical opinion is not credible in light of the fact that Dr. Payne testified that she authorized Anderson to return to work in August 2000, during Anderson's sixth month of pregnancy. (Unum Br. at 11, 13 (citing Dr. Payne Dep. at 110–11).) Unum asserts that Dr. Payne's authorization is contrary to her opinion that Anderson was disabled. The evidence, however, establishes that Dr. Payne did not release Anderson to work based upon her [Dr. Payne's] medical opinion that Anderson was able to work and no longer disabled, but rather on the basis that Anderson communicated that she was "financially forced" to return to work. (Dr. Payne Dep. at 31 (Ex. to Doc. No. 31).) Indeed, Dr. Payne warned Anderson of the risks of returning to her job at Shaw Industries. Dr. Payne further testified that she would not be "surprised" to learn that Anderson left Shaw Industries before a week's end which is what occurred. (Payne Dep. at 31–32, 110–11 (Ex. to Doc. No. 94).) In short, the court finds that Unum's argument is insufficient to establish that Dr. Payne ever determined that Anderson was anything other than disabled and unable to work. Stated a different way, the court finds that testimony which UNUM has cited is not in conflict

with Dr. Payne's ultimate opinion that Anderson was disabled so as to preclude the court from relying on Dr. Payne's diagnosis. *Cf. Sharrar v. Felsing*, 128 F.3d 810, 818 (3d Cir.1997) ("where no genuine issue as to any material fact exists and where credibility conflicts are absent, summary judgment may be appropriate").

Having rejected Unum's arguments, the court emphasizes that both parties have cited as authoritative the ACOG policy statement on "pregnancy disability." That statement sets out, among other things, that "[t]he onset, termination and cause of the disability as related to pregnancy can only be determined by a physician." (Policy Statement (UPCL00027) (Ex. to Doc. No. 90).) Dr. Payne was confident in her assessment that the physical requirements of Anderson's job at Shaw Industries were impossible for Anderson to perform due to the intense side effects of her pregnancy, and there is no opinion by another physician showing that Anderson's pregnancy complications were other than described by Dr. Payne. Significantly, the only opinion rendered by a physician in this case as to Anderson's ability to work is from Dr. Payne.[23]

In sum, the court finds that based upon Dr. Payne's opinion, the only medical opinion rendered by a physician in this case, and the other evidence in the record discussed herein, Anderson has demonstrated that, from March 29, 2000, to January 3, 2001, by virtue of the complications surrounding her pregnancy, she was unable to perform the "material and substantial duties" of her job at Shaw Industries. (Policy, UPCL00057.)

As stated, Anderson must satisfy two additional criteria to be eligible for benefits. As to the second criterion, no argu-

---

**23.** The court notes that Boothby has made a passing reference to a "Dr. Adair," but this reference has no evidentiary value. There is absolutely no evidence in the record or men-

tion in the briefs as to who this individual is, what his or her role was, if any, in evaluating Anderson's claim for disability benefits, or the origin of the title "Dr."

ment has been advanced that Anderson did not experience a "20% or more loss" in her "indexed monthly earnings" due to her absence from work during the time period that Dr. Payne rendered Anderson disabled due to pregnancy complications. (*Id.*) The court, therefore, finds that Anderson has met this policy condition.

 Under the third criterion, Anderson must complete a 90–day elimination period before she is eligible for long-term disability benefits. (*Id.*) As stated, Anderson seeks long-term disability benefits under the policy, beginning June 22, 2000. Anderson appears to have calculated the 90 days from the date she last worked, which was March 23, 2000. (*See, e.g.,* Attending Physician Statement (UPCL00003) (Ex. to Doc. No. 90)); (Dr. Payne Dep. at 104 (Ex. to Doc. No. 93).) March 29, 2000, however, is the date upon which Dr. Payne testified that she determined that Anderson was "disabled" (*see* Dr. Payne Dep. at 22–23 (Ex. to Doc. No. 90)), meaning that June 26, 2000, is the ninetieth day for purposes of computing the elimination period.[24] The court, therefore, finds that Anderson was "disabled" within the meaning of the policy from June 27, 2000, to and including January 2, 2001, *see supra* footnote 22, and that Unum erred in denying her long-term disability benefits during this period.

## C. *Additional Observations*

The court does not want to leave the impression that, if its review had been restricted to the administrative record, Unum would have been entitled to an easy victory. Anderson's secondary line of argument for recovery is that Unum did not conduct an adequate investigation of her claim prior to denying it.[25] Because of Unum's failure to investigate, Anderson argues that, even if the court were confined to the administrative record, under a heightened arbitrary and capricious standard of review, Unum did not have sufficient evidence upon which to base a reasonable decision.

The court observes, without making any express findings, that Anderson's position finds support from several facts in the record. First, Unum had in its possession Dr. Payne's statement that Anderson was unable to work (UPCL00003 (Ex. to Doc. No. 90)), yet it apparently did not deem it important or necessary to speak directly with Dr. Payne to seek clarification as to the basis for her opinion. The court is not convinced, as Unum is, that UNUM's contact with Herbal in Dr. Payne's office confirmed the absence of evidence as to any work restrictions or limitations created by Anderson's pregnancy. Although Herbal told Chambers, the Genex nurse, that no restrictions were *written*, the absence of any written notation apparently was not conclusive in Herbal's mind, as Herbal relayed that she would inquire of Dr. Payne as to whether there were any restrictions. (UPCL00013.) Yet, from aught that appears, UNUM denied Anderson's claim the

---

**24.** The court recognizes that, on March 29, 2000, Dr. Payne appears to have placed Anderson on "leave," retroactive to March 23, 2000, the last day Anderson reported to her job at Shaw Industries. (*See* UPCL00003.) However, when Dr. Payne rendered her opinion that she deemed Anderson "disabled" on March 29, 2000, Dr. Payne did not state that her "disability" assessment applied retroactively to March 23, 2000, and the court declines to so read her testimony.

**25.** Although UnumProvident is the entity which the court has found actually made the claims determination in Anderson's case, the court refers to "Unum" because Unum undisputedly is the party ultimately responsible for the acts of UnumProvident. (*See* Unum Br. at 1 n. 1); (*see also, supra,* footnote 17; Unum Br. at 13 n. 6 (Doc. No. 93) (Unum, not UnumProvident, "will be liable on [Anderson's] claim should the Court decide in [Anderson'] favor.").)

next day without any further inquiry and seemingly in contradiction to the statement in its letter to Anderson, dated June 12, 2000, that it would "contact [her] if additional information is necessary to determine [her] eligibility for benefits." (UPCL00009 (Ex. to Doc. No. 90).)

Second, Unum did not independently observe Anderson's activities, nor did it order an independent medical examination or review by an independent or in-house physician, notwithstanding ACOG's policy statement that "[t]he onset, termination and cause of the disability as related to pregnancy can only be determined by a physician." (UPCL00027 (Ex. to Doc. No. 90).) Rather, Unum chose to rely only upon a nurse's review and the opinion of the claims person. While the court agrees with Unum that the law does not require Unum to give any opinion of Anderson's treating physician controlling weight, (*see* Unum Br. at 13 n. 5 (Doc. No. 93); *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 834, 123 S.Ct. 1965, 155 L.Ed.2d 1034 (2003)), the court questions whether it was reasonable for Unum to deny Anderson's claim without obtaining an independent medical evaluation by a physician. *See Fought v. Unum Life Ins. Co. of America*, 379 F.3d 997, 1015 (10th Cir. 2004) ("We note that, while not required, independent medical examinations are often helpful.... Where, as here, a conflict of interest may impede the plan administrator's impartiality, the administrator best promotes the purposes of ERISA by obtaining an independent evaluation.");

*Levinson*, 245 F.3d at 1324 & 1326–27 & n. 7 (holding that there was no reasonable basis for administrator to reject treating physician's opinion where it did not conduct an independent medical examination, but instead relied solely on the report of an in-house nurse and the opinion of its claims person). Courts have recognized that a strong indicator of a comprehensive investigation is an insurance company's attainment of the opinion of an independent expert. *See Hightshue v. AIG Life Ins. Co.*, 135 F.3d 1144, 1148 (7th Cir.1998) ("Seeking independent expert advice is evidence of a thorough investigation."); *see also Rigby v. Bayer Corp.*, 933 F.Supp. 628, 633 (E.D.Tex.1996) (collecting cases).

The court fully is cognizant of Unum's counter-argument that the blame for any deficiencies in the record before the claims administrator should fall on Anderson for her failure to submit "objective medical evidence" of her disability during the claim review process. (Unum Br. at 9–10 (Doc. No. 93)); (UPCL00067 (Ex. to Doc. No. 93).) Notably, however, in formulating its argument, Unum has not mentioned the provision in the policy self-imposing upon Unum a "duty to [operate the plan] prudently and in the interest of [Anderson] and other plan participants and beneficiaries." (*See* UPCL00042.) A strong argument can be made that the facts before Unum regarding Anderson's disability did not justify Unum closing its case file and denying her claim, but rather were sufficient to warrant, if not require, Unum to investigate further Anderson's claim.[26]

---

**26.** The court notes, for example, that Unum justifies its denial, in part, based upon Dr. Payne's "past pregnancy history" notation in the Attending Physician Statement, asserting that Anderson failed to present objective medical evidence of a present pregnancy disability. (*See* Attending Physician Statement (UPCL0003).) The court agrees that a present determination of pregnancy disability cannot be based solely upon symptoms from a prior pregnancy. However, to the extent that Dr. Payne's reference to "prior pregnancy history" was confusing in light of Dr. Payne's statement on the same form that Anderson was unable to work, an equally, if not more, persuasive argument can be made that UNUM should have sought clarification, rather than issuing what appears to be a perfunctory denial.

*See Gaither v. Aetna Life Ins. Co.,* 394 F.3d 792, 807–08 (10th Cir.2004) (although acknowledging that claims administrator is not required to conduct a fishing expedition in search of evidence to support a speculative claim, "fiduciaries cannot shut their eyes to readily available information when the evidence in the record suggests that the information might confirm the beneficiary's theory of entitlement and when they have little or no evidence in the record to refute that theory"); *see Vega v. Nat'l Life Ins. Servs., Inc.,* 188 F.3d 287, 299 (5th Cir.1999) (declining to impose an express duty on the conflicted administrator to reasonably investigate a claim, but adopting an approach which it admitted "[i]n many cases will reach the same result as one that focuses on whether the administrator has reasonably investigated the claim"). Finally, the court observes that Unum's argument, placing the full burden on Anderson, loses potency when weighing Anderson's education and knowledge of insurance matters against Unum's obviously-superior expertise in insurance matters.

In addition to examining the facts which Anderson says raise a question as to the thoroughness of the investigation, the court is aware of Anderson's argument that the investigation lacked the requisite characteristic of good faith. Anderson's argument presents yet another hurdle which Unum would be required to clear under the arbitrary and capricious standard of review.[27] For example, Anderson

has submitted evidence that her claim was not decided based upon the normal procedures used by Unum for investigating claims for benefits, (*see* Howard Dep. at 79–80 (Ex. to Doc. No. 90)), and has argued that the evidence establishes that the customer care specialist who made the decision to deny her claim was not qualified. (*See* Anderson Br. at 9 (Doc. No. 90)); *see Fick v. Metropolitan Life Ins.,* 347 F.Supp.2d 1271, 1286 (S.D.Fla.2004) (observing that evidence that a conflicted claims administrator abused its discretion may include proof that administrator deviated from normal practices for evaluating claims or that claims administrator was not competent).

### D. Benefits to which Anderson is Entitled and Prejudgment Interest

■■■ Anderson is precluded from obtaining compensatory and punitive damages. *See Godfrey,* 89 F.3d at 761; *see also, supra,* footnote 13. ERISA limits Anderson's recovery to equitable relief. Equitable relief includes recovery of the policy benefits which she was wrongfully denied. *Hunt v. Hawthorne Assoc., Inc.,* 119 F.3d 888, 907 (11th Cir.1997); *see* 29 U.S.C. § 1132(a)(1)(B) (authorizing recovery of "benefits due … under the … plan").

The court has ascertained that Anderson is entitled to benefits, from June 27, 2000, to and including January 2, 2001.

---

**27.** *See Vann v. National Rural Elec. Co-op Assoc. Retirement and Sec. Program,* 978 F.Supp. 1025, 1038 (M.D.Ala.1997) ("Under the arbitrary and capricious standard of review, the court is limited to deciding whether the interpretation of the plan was made rationally and in good faith, not if it was correct."); *Mann v. Prudential Ins. Co. of America,* 790 F.Supp. 1145, 1152 (S.D.Fla.1992) ("[W]hen reviewing a claim denial to determine if the denial was arbitrary and capricious, the court simply must determine whether there was a reasonable basis for the decision based upon the facts known to SBT at the time of the decision and whether the denial was made in good faith."); *Stormont–Vail Regional Medical Ctr. v. Kansas Bldg. Trades Open–End Health & Welfare Fund Uninsured Benefit Plan,* 1990 WL 11377, *5 n. 2 (D.Kan. Jan.8, 1990) (noting that under arbitrary and capricious review of denials of benefits under ERISA plans, "second tier" of analysis consists of evaluating "good faith" of claims administrator) (citing *Dennard v. Richards Group, Inc.,* 681 F.2d 306, 316 (5th Cir. 1982)).

Anderson claims that she is entitled to recovery based upon a "monthly benefit amount of $983.84." (Anderson Br. at 18 (Doc. No. 90)); (1st Am. Compl. at 4 (Doc. No. 40).) Anderson, however, has not provided the figures she used to arrive at this total. Unum responds that, "[s]hould the Court determine that [Anderson] is entitled to relief, Unum disputes [Anderson's] calculation of benefits." (Unum Br. at 18 n. 9 (Doc. No. 93).) Unum, however, does not elaborate as to the nature of its dispute with Anderson's calculation or state why it has elected not to brief the issue of relief.[28]

As an initial matter, the court can envision no reason why it should prolong the calculation of benefits through further briefing and/or evidentiary submissions. The order setting the briefing schedule did not segregate the determination of liability from that of damages. (Doc. No. 94.) Although admittedly more thorough discussion by the parties in their briefs concerning the calculation of benefits would have been helpful, the court finds that the record is adequate for a determination thereof and that Unum has waived its opportunity to brief the issue of damages. Accordingly, the court proceeds to a determination of relief.

The court first turns to consideration of the monthly benefit amount. The "Benefits at a Glance" portion of the policy provides that disability payments are the equivalent of 60 percent of "monthly earnings," but cannot exceed $1,000 per month.[29] (UPCL00069.) The Glossary defines "monthly earnings" to mean the claimant's "gross monthly income from your Employer as defined in the plan." (UPCL00038.) Anderson's hourly rate of pay was $9.46. (UPCL00006.) Neither Anderson nor Unum has set forth the method each used to translate Anderson's rate of hourly pay into a "monthly earning" from which the monthly benefit is determined. Through its independent calculation, however, the court arrived at the same figure by using the following equation: Anderson's hourly rate ($9.46) $\times$ 2,080 hours worked per year (40 hours per week for 52 weeks) / 12 months $\times$ 60% = $983.84.[30] (See UPCL00006.)

Having figured the monthly benefit, the court now must determine the total benefits to which Anderson is entitled under the policy. The period of time from June 27, 2000, to and including January 2, 2001 encompasses six whole months and two partial months. The court has calculated Anderson's benefits for July, August, September, October, November and December by multiplying the monthly benefit by six: 6 months $\times$ $983.84 = $5903.20. As to Anderson's benefits for the two partial months, the court has calculated as a percentage the benefits to which she is entitled based on the initial premise that there

28. Incidentally, Unum's internal records reflect that Unum also has calculated Anderson's "monthly benefit" as $983.84. (UPCL00080.)

29. Although the policy provides that payments "may be reduced by deductible sources of income," such as social security benefits and disability earnings, there is no evidence that Anderson had any deductible sources of income during the time frame at issue. (UPCL00069.)

30. Anderson, a full-time employee, worked rotating shifts equivalent to a 40–hour work week. (See, e.g., UPCL00006.) Additionally, although calculations are notably absent from the record, the court has deduced that Anderson and Unum also computed the monthly benefit based upon an hourly rate of pay of $9.46. Furthermore, the court notes that no argument has been proffered by either party that the policy requirements pertaining to the use of W–2 forms in computing the monthly earnings were not adhered to when each arrived at a monthly benefit total of $983.84. (See UPCL00056.)

is an average of 30 days per month. Anderson is entitled to a partial monthly benefit for four days in June which translates into an approximate percentage of 13 percent. Her benefit for June, therefore, equals 13 percent of $983.84, or $127.90. Anderson also is entitled to a partial monthly benefit for two days in January which translates into an approximate percentage of 7 percent. Anderson's benefit for January, thus, equals approximately 7 percent of $983.84, or $68.87. Totaling these figures ($5903.20 plus $127.90 plus $68.87), the court finds that Anderson is entitled to benefits under the policy in the amount of $6099.97.

■■■ Anderson also has requested prejudgment interest. (Anderson Br. at 18 (Doc. No. 90)); (1st Am. Compl. at 4 (Doc. No. 40).) ERISA does not contain an express provision providing for prejudgment interest, but such an award is allowable at the discretion of the court. *Engelhardt v. Paul Revere Life Ins. Co.*, 77 F.Supp.2d 1226, 1236 (M.D.Ala.1999) (citing *Florence Nightingale Nursing Serv., Inc. v. Blue Cross/Blue Shield of Alabama*, 41 F.3d 1476, 1484 (11th Cir.1995) ("The award of an amount of prejudgment interest in an ERISA case is a matter 'committed to the sound discretion of the trial court.'")); *see also Smith v. Am. Int'l Life Assurance Co. of New York*, 50 F.3d 956, 957 (11th Cir.1995) (awarding prejudgment interest where plaintiff received judgment for benefits).

■■■ The court finds that an award of prejudgment interest is appropriate in this case to fully redress Anderson for the time frame during which she was denied the full use of the money to which she was lawfully entitled and to prevent unjust enrichment to Unum. *Engelhardt*, 77 F.Supp.2d at 1236; *see also Ford v. Uniroyal Pension Plan*, 154 F.3d 613, 616 (6th Cir.1998) (finding that award of prejudgment interest serves to compensate the plaintiff "for the lost interest value of the money wrongly withheld from him or her").

The court shall calculate the prejudgment interest rate at the rate set forth in § 27–1–17(c) of the Code of Alabama. *See Nightingale*, 41 F.3d at 1484; *Engelhardt*, 77 F.Supp.2d at 1236. Section 27–1–17 sets forth an interest rate of "1.5 percent per month [18 percent annually] prorated daily[.]" Ala.Code § 27–1–17(c) (brackets added); *see also Nightingale*, 41 F.3d at 1484. Accordingly, the court finds that Anderson is entitled to prejudgment interest at a rate of 1.5% per month (18% annually) from June 23, 2000, which is the date Unum first denied Anderson's claim for benefits (*see* UPCL00014–15), to the date of today's date of judgment.[31]

Anderson also has requested, and may be entitled to, an award of attorney's fees. *See* 29 U.S.C. § 1132(g). The court instructs the parties to confer in an effort to reach an agreement on this issue. If the parties are unable to agree, the court instructs Anderson to file any motion for attorney's fees, together with supporting documentation and a brief, on or before March 10, 2006.

---

31. The court notes that Anderson automatically is entitled to any postjudgment interest accruing subsequent to the entry of the judgment at the rate provided by statute. *See* 28 U.S.C. § 1961; *U.S. S.E.C. v. Carrillo*, 325 F.3d 1268, 1271 (11th Cir.2003) ("The prevailing party ... is statutorily entitled to postjudgment interest under 28 U.S.C. § 1961. The district court does not have any discretion to deny or modify the terms upon which the [prevailing party] may receive postjudgment interest under § 1961"); *Johansen v. Combustion Engineering, Inc.*, 170 F.3d 1320, 1339 & n. 37 (11th Cir.1999) ("interest accrues from the date of a judgment whether or not the judgment expressly includes it, because 'such interest follows as a legal incident from the statute providing for it.'") (citation omitted).

## V. ORDER

Based on the foregoing, it is CONSIDERED and ORDERED as follows:

(1) Judgment is due be entered in favor of Plaintiff Donya Anderson and against Defendant Unum Life Insurance Company of America on her claim for benefits brought pursuant to 29 U.S.C. § 1132(a)(1)(B) in the amount of $6099.97, plus prejudgment interest;

(2) Anderson is hereby AWARDED prejudgment interest at a rate of 1.5% per month to be calculated from June 23, 2000, to today's date of judgment;

(3) if the parties are unable to resolve the attorney's fee issue, Anderson is DIRECTED to file her motion for attorney's fees, together with a brief and evidentiary support, on or before March 10, 2006; Unum shall have until March 24, 2006 to respond; and

(4) costs are hereby TAXED against Unum for which let execution issue. A separate judgment shall be entered contemporaneously herewith.